UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>NADER AL-NAJI,<br><br>Defendant,<br><br>and<br><br>BUSE DESTICIOĞLU AL-NAJI, JOUMANA BAHOUTH AL-NAJI, INTANGIBLE HOLDINGS, LLC, FIRESTORM MEDIA, LLC, VIRIDIAN CITY, LLC, and DESO FOUNDATION,<br><br>Relief Defendants. | Case No. 24 Civ. 5738<br><br>ECF Case<br><br>JURY TRIAL DEMANDED<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Nader Al-Naji ("Al-Naji" or "Defendant") and Buse Desticioğlu Al-Naji, Joumana Bahouth Al-Naji, Intangible Holdings, LLC, Firestorm Media, LLC, Viridian City, LLC, and DeSo Foundation (collectively, "Relief Defendants"), alleges as follows:

## SUMMARY

1.     From at least November 2020 until the present, Defendant Al-Naji raised more than $257 million by offering and selling crypto asset securities to investors while lying to them about the supposedly "decentralized" nature of the project he was promoting and while illegally diverting

millions of investor funds into luxury purchases to enrich himself, his close relatives, and his companies.

2.      Al-Naji's fraud revolved around a crypto asset called "BTCLT," the native token to BitClout, a blockchain-based platform Al-Naji also created.  Al-Naji offered and sold BTCLT as a security, but never registered those offers and sales with the Commission, although he was required to do so under the federal securities laws.

3.      From the beginning and continuing through the BitClout platform's March 2021 public launch and after, Al-Naji marketed BTCLT as an investment that would increase in value as the BitClout platform grew—a means of generating a return by "betting on" the success of BitClout. Al-Naji even likened BTCLT to "stock that allows you to own a piece of the platform."

4.      He further represented that anyone could buy BTCLT through BitClout's built-in "decentralized exchange" that was "available on the 'Buy BitClout' page" on BitClout's website where the price automatically "double[d] for every million" BTCLT sold, and that he expected the asset to eventually be traded on third-party crypto asset trading platforms.

5.      At the same time, in a deceptive attempt to avoid regulatory scrutiny, Al-Naji sought to portray BitClout as a "decentralized" platform with "no company behind it … just coins and code." For example, Al-Naji launched BitClout using the online pseudonym "Diamondhands," attempting to further the illusion that BTCLT was autonomous and had no one, identifiable issuer.

6.      In reality, as Al-Naji knew or recklessly disregarded, he controlled the issuance of BTCLT from the BitClout platform, including controlling which investors could obtain the crypto asset security and at what price it was sold.  He also controlled the "treasury wallet" on the blockchain that held the proceeds from the sales of BTCLT and used these proceeds as he desired and for his own personal benefit, as further set forth herein.

7.     To facilitate the sales of BTCLT to investors, Al-Naji incorporated an entity, Relief Defendant Intangible Holdings, LLC ("IHL").  IHL entered into sales contracts for BTCLT with investors, received funds from them, and custodied BTCLT for and/or transferred BTCLT to those investors.  IHL ultimately transferred the proceeds from these sales to BitClout's treasury wallet controlled by Al-Naji.

8.     The BitClout platform was structured such that investors *could buy* BTCLT using bitcoin on the platform but *could not sell* BTCLT for bitcoin.  This further allowed Al-Naji to accumulate the bitcoin that investors poured into the platform in the treasury wallet that he controlled and made it harder for BTCLT investors to cash out of their investment.

9.     In total, the BitClout treasury wallet amassed more than $257 million in bitcoin from investors from the beginning of Al-Naji's unregistered offers and sales of BTCLT during the period of November 2020 to the present.

10.     Around the time of BitClout's public launch in March 2021, Al-Naji explicitly and publicly assured investors—using his Diamondhands pseudonym—that neither he nor others involved in the BitClout project would use funds in the treasury wallet to pay themselves any salaries because, instead, his and BitClout's employees' financial incentives were tied to the success of BTCLT itself.

11.     These representations were false, as Al-Naji knew or recklessly disregarded. Contrary to his assurances, Al-Naji used significant sums of money raised from investors to enrich himself and others close to him.  This included the rental of a six-bedroom mansion in Beverly Hills, payment of personal credit card bills, and extravagant gifts of cash (totaling at least $2.9 million) to family members, including Relief Defendants Buse Desticioglu Al-Naji (his wife) and Joumana

Bahouth Al-Naji (his mother). He also transferred investor funds to developers, programmers, and promoters of the BitClout platform, contrary to his public statements.

12.    By engaging in this conduct, as further described herein, Defendant Al-Naji violated and, unless restrained and enjoined by the Court, may continue to violate Sections 5(a) and (c) and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), (c), q(a), and Section 10(b) of the Securities Exchange Action of 1934 ("Exchange Act") 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to Securities Act Sections 20(b) and 22(a), 15 U.S.C. §§ 77t(b) and 77v(a), and Exchange Act Sections 21(d), 21(e), and 27, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa. In connection with the conduct alleged in this Complaint, Defendant, directly or indirectly, has made use of the means or instruments of transportation or communication in interstate commerce, or the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange.

14.    Venue is proper in this District pursuant to Securities Act Section 22, 15 U.S.C. § 77v, and Exchange Act Section 27, 15 U.S.C. § 78aa. Certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within this District. In particular, Defendant fraudulently offered and sold BTCLT to investors within this District.

## DEFENDANT

15.    **Nader Al-Naji**, age 32, is a U.S. citizen who resides in Los Angeles, California. He personally conceived of and created the BitClout blockchain protocol, which is now known as the "DeSo" blockchain protocol. Al-Naji also developed and created the BitClout platform and

4

BTCLT.  He solicited investors to purchase BTCLT to fund the development of the BitClout platform.  He further made public misrepresentations about the use of, and misappropriated, investors proceeds raised from the sale of BTCLT.  Al-Naji asserted his Fifth Amendment right against self-incrimination concerning the subject matter of this Complaint during the SEC's investigation into this matter.

## RELIEF DEFENDANTS

16.    **Buse Desticioğlu Al-Naji,** age 32, resides in Los Angeles.  She is Defendant Al-Naji's wife.  Upon information and belief, she received BitClout investor funds from Defendant Al-Naji to which she had no entitlement.

17.    **Joumana Bahouth Al-Naji**, age 68, resides in California.  She is Defendant Al-Naji's mother.  Upon information and belief, she received BitClout investor funds from Defendant Al-Naji to which she had no entitlement.

18.    **IHL** is a Delaware limited liability company established on July 6, 2020.  Defendant Al-Naji owns IHL and is its sole officer and director.  IHL maintained bank and crypto asset trading platform accounts to which BitClout investor funds were directed and transferred.

19.    **Firestorm Media, LLC** is a Colorado limited liability company established on April 19, 2021.  Defendant Al-Naji owns Firestorm Media, LLC and is its sole officer and director.  Firestorm Media, LLC maintained a bank account to which BitClout investor funds were transferred.

20.    **Viridian City, LLC** is a New Mexico limited liability company established on June 7, 2021.  Defendant Al-Naji owns Viridian City, LLC and is its sole officer and director.  Viridian City, LLC maintained a bank account to which BitClout investor funds were transferred.

21.    **DeSo Foundation** is a Delaware corporation established on August 27, 2021.  Al-Naji owns DeSo Foundation and is its sole officer and director.  DeSo Foundation maintained a bank account to which BitClout investor funds were transferred.

## BACKGROUND ON SECURITIES OFFERINGS

22.    Congress enacted the Securities Act to regulate the offer and sale of securities.  In contrast to commercial principles of *caveat emptor* (or buyer beware), Congress in the Securities Act enacted a regime of full and fair disclosure, requiring those who offer and sell securities to the investing public to provide sufficient, accurate information to allow investors to make informed decisions before they invest.

23.    Sections 5(a) and 5(c) of the Securities Act generally require an issuer of securities to register an offering of securities through an effective registration statement before the securities are offered and sold to the public.  *See* 15 U.S.C. §§ 77e(a) and (c).  Registration statements for a securities offering provide public investors with, among other things, material information about the issuer and the securities to be offered and sold.

24.    Section 2(a)(1) of the Securities Act defines "security" to include a wide range of investment vehicles, including an "investment contract."  15 U.S.C. § 77b(a)(1).  An investment contract, for purposes of the Securities Act, includes any "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits" from the efforts of others.  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).  This broad definition is "flexible" and "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *Id.* at 299.

## BACKGROUND ON CRYPTO ASSETS

25.     As used herein, the terms "crypto asset," "digital asset," or "token" generally refer to an asset issued and/or transferred using blockchain or distributed ledger technology, including assets referred to colloquially as "cryptocurrencies," "virtual currencies," and digital "coins."

26.     A blockchain or distributed ledger is a database spread across a network of computers that records transactions in theoretically unchangeable, digitally recorded data packages, referred to as "blocks."  These systems typically rely on cryptographic techniques to secure recording of transactions.

27.     A blockchain "protocol" is a code, software, or algorithm that governs how a blockchain, or a feature of a blockchain, operates, including, among other things, the validation mechanism used for the particular blockchain.

28.     Crypto asset owners typically store the software providing them control over their crypto assets on a piece of hardware or software called a crypto "wallet."  Crypto wallets offer a method to store and manage critical information about crypto assets, i.e., cryptographic information necessary to identify and transfer those assets.  The primary purpose of a crypto wallet is to store the "public key" and the "private key" associated with a crypto asset so that the user can make transactions on the associated blockchain.  The public key is colloquially known as the user's blockchain "address" and can be freely shared with others.  The private key is analogous to a password and confers the ability to transfer a crypto asset.  Whoever controls the private key typically controls the crypto asset associated with that key.

29.     On July 25, 2017, the SEC issued a *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, advising "those who would use . . . distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to

ensure compliance with the U.S. federal securities laws," and finding that the offering of crypto assets at issue in that report involved investment contracts and thus securities.

## FACTUAL ALLEGATIONS

### A.    The BitCout Platform and BTCLT

30.    In 2019, Al-Naji began designing BitClout, a web and application-based social media platform with an interface that promised to be a "new type of social network that mixes speculation and social media."

31.    A key selling point for BitClout was that like X, formerly known as Twitter, BitClout users could post content and "like" or share their own or other users' content.

32.    Al-Naji also claimed that BitClout would be "decentralized" and its content would be stored and indexed on a blockchain, instead of being controlled by a single corporate entity or person. As such, the platform would purportedly be resistant to censorship.

33.    BitClout's "White Paper" (marketing materials that described the BitClout project) touted BitClout as "like Bitcoin" because it was "a fully open-source project" with "no company behind it – it's just coins and code."

34.    The White Paper further explained that BTCLT would be the native token[1] of the BitClout project.

35.    According to documents prepared by Al-Naji in conjunction with the BitClout project, the price of BTCLT would automatically double for every million BTCLT sold directly from the BitClout platform, with Al-Naji reserving two million BTCLT for himself as the project's founder.

---

[1] Some crypto assets are "native tokens" to a particular blockchain—meaning that they are represented on their own blockchain and may be needed as part of the mechanism used to confirm transactions on the blockchain.

36.     Al-Naji explained that purchasing BTCLT through the BitClout platform involved a "totally decentralized" so-called "atomic swap" whereby investors would deposit the crypto asset bitcoin into BitClout's treasury wallet and receive BTCLT in exchange.

37.     This exchange, however, only operated in one direction, meaning that BTCLT investors could not exchange their tokens back into bitcoin or fiat currency (e.g., U.S. dollars) via the BitClout platform.  This fact was not explained in the BitClout White Paper.

38.     Al-Naji privately explained to an early investor that he viewed this technical limitation as a positive feature of the platform because restricting the ability to sell BTCLT had the effect of driving up its price.

39.     The BitClout platform was further billed as allowing investors to speculate by creating an opportunity for them to monetize their social media profile and to invest in the profiles of others through "Creator Coins."

40.     Creator Coins were described in the White Paper as a "new type of asset class" whose value "is tied to the reputation of an individual" or their "standing in society."

41.     Every user on the platform was able to generate a Creator Coin by creating a profile. In what Al-Naji later described as a "growth hack," BitClout preloaded profiles for the "top 15,000 influencers from Twitter" onto the platform and had Creator Coins "minted," or created, for them.

42.     These influencers could claim their "reserved" profiles by posting their BitClout public key address on Twitter, which would result in the influencers receiving a percentage of the Creator Coins associated with their profiles—ostensibly an incentive for the influencers to join and promote the platform.

43.     Investors could buy (or sell) Creator Coins of any profile with BTCLT, regardless of whether individuals associated with a profile sanctioned BitClout's use of their identities.

44.    The White Paper described Creator Coins this way:

> Creator coins are a new type of asset class that is tied to the reputation of an individual, rather than to a company or commodity. They are truly the first tool we have as a society to trade "social clout" as an asset. If people understand this, then the value of someone's coin should be correlated to that person's standing in society … Thus, people who believe in someone's potential can buy their coin and succeed with them financially when that person realizes their potential.  And traders can make money buying and selling the ups and downs.

**B.    Al-Naji's Offer and Sale of BTCLT to Investors**

45.    As described in detail below, Defendant offered and sold BTCLT tokens as investment contracts and, therefore, as securities.

46.    BTCLT purchasers invested money and reasonably expected profits or returns derived from the entrepreneurial or managerial efforts of others, namely Al-Naji.  Purchasers of BTCLT also invested into a common enterprise with other investors and with Al-Naji, who held a significant percentage of all BTCLT in existence.  Moreover, because BTCLT tokens are fungible with each other, all investors shared equally in price increases—or together suffered price decreases—of BTCLT.

**1.    The Solicitation and Marketing of BTCLT to Select Investors**

47.    Starting in late 2020 and continuing through at least March 2021, Al-Naji solicited investments to fund BitClout's development by selling BTCLT to venture capital funds and other prominent investors in the crypto asset community.

48.    From the outset, continuing through the project's public launch in March 2021, and thereafter, Al-Naji marketed BTCLT as an investment into the potential success of the BitClout platform—a crypto asset that would increase in value as the BitClout platform grew, or a means of generating a return by "betting on" the success of BitClout.

49.     The fundamental investment thesis that Al-Naji marketed was that because BTCLT would have to be "burned" (or used) anytime someone interacted (i.e., posted, liked, re-posted) with the social media platform, BTCLT would become "more scarce" (to use Al-Naji's explanation in a podcast interview) and, therefore, more valuable as the BitClout platform became more popular.  In that interview, Al-Naji explained that this mechanism essentially meant that investment returns "flow[] back to the holders of [BTCLT] via fees that are essentially burned."

50.     For example, Al-Naji stressed in response to an inquiry from an investor that BitClout employees would hold BTCLT, such that the financial fortunes of those working on the project were aligned with the financial fortunes of BTCLT investors, because everyone's profits would result from an increase in BTCLT's value.

51.     Al-Naji also pooled proceeds from the sale of BTCLT in the treasury wallet, which were used, in part, to pay costs related to maintaining, developing, and marketing the platform.

52.     BTCLT investors reasonably expected those profits to come from the managerial and entrepreneurial efforts of its promoter, as Al-Naji invited them to do.  This objective reality is confirmed by several early investors who stated they invested in BTCLT given Al-Naji's "well-known enough" reputation and his ability to develop the BitClout platform.

53.     Similarly, in November 2020, Al-Naji explained to prospective employees and early investors in a document entitled "State of the BitClout" that BTCLT was "simultaneously the currency powering the platform and the stock that allows you to own a piece of the platform. This makes it so that everybody who's using the platform, especially the early adopters, get to share in the upside of the platform as it grows."

54.    Moreover, the platform that Al-Naji designed automatically increased BTCLT's price with every token sold (doubling for every million sold) guaranteeing that the investment opportunity would benefit early investors of the token.

55.    Al-Naji used this fact to advertise the profit potential for buying and holding BTCLT.  For example, on November 9, 2020, Al-Naji told an early investor that he:

> expect[ed] we will get all the [venture capital] funds to be in before the public launch which will push the price up quite a bit.  You can see in the schedule if we raise even a few million from them, as we expect to do, the protocol price will easily be 4-8x what it is now (and could be much more if we decide to raise aggressively like we did with [a different crypto asset project] before, which we are still considering).  We wanted to wait to talk to them to have you involved first for this reason— our most valuable partners should be in at the ground floor 😊

56.    Despite the one-way setup described above that made it possible to buy—but not sell—BTLCT on the BitClout platform, Al-Naji nonetheless assured investors that he always intended to have BTCLT made available for trading (or "listed") on crypto asset trading platforms following BitClout's public launch, so that those early investors could monetize their investments.

57.    In addition, he touted that the investment arms of prominent crypto asset trading platforms, including Coinbase, Huobi, and Gemini, were also early investors in BitClout and would be incentivized to see BTCLT trading on their respective platforms.

58.    For example, Al-Naji told an early investor in February 2021 that "Huobi and Gemini seem like they're eager to start the [listing] process with us but we think it's best to wait to do it until a couple months after the [BitClout] app is live.  That will make it so that people can only buy [BTCLT on the BitClout platform], which will push the price up really high and set a higher starting point for when we get listing."

59.     At the same time, in keeping with Al-Naji's goal to launch BitClout under the guise of a decentralized project with "no company behind it … just coins and code," in March 2021 he adopted the pseudonym "Diamondhands" in preparation for BitClout's public launch.

60.     As Al-Naji had explained to an early investor in September 2020, he wanted to "launch 'well-known enough' that people in the industry know that it's me but 'anonymously enough' that the average person visiting the website (or the average regulator) won't know without having to do a 'real investigation.'"

61.     Al-Naji sought to precisely do just that, leveraging his connections and reputation within the crypto asset community to raise substantial funds for the project while publicly launching that project behind a pseudonym to hide his ownership and control from "average" users and regulators.

62.     Consistent with his attempt to portray BTCLT as being sold autonomously, without an identifiable promoter, Al-Naji told investors in February 2021, in a document entitled "Supply Curve Summary" that "the 'counter-party' for a typical [BTCLT] purchase is the blockchain itself, and there is therefore no centralized issuer of the currency."

**2.     Misleading Attempts to Avoid Regulatory Scrutiny**

63.     The perception that there was no issuer of BTCLT was also critical to Al-Naji's strategy of attempting to avoid regulatory scrutiny for his project.

64.     Al-Naji understood that the test for whether something was offered or sold as an "investment contract" was set out by the U.S. Supreme Court in *Howey* and he understood that the SEC applied this test to determine if a crypto asset was being offered and sold as a security.

65.     To one crypto asset industry participant and prospective investor, Al-Naji explained his reasoning and attempts to avoid regulatory scrutiny as follows:

> My impression is that even being 'fake' decentralized generally
> confuses regulators and deters them from going after you. In the
> case of the SEC it gives you a strong argument [with respect to]
> Howey, but more broadly when you break the mold of 'a company
> with money in a bank,' the case becomes riskier in terms of
> litigation, which makes it less likely some career public servant will
> make it their mission to take you down.

66.     In addition to attempting to use the facade that BitClout was not controlled by anyone to avoid regulatory scrutiny, he also used it to procure a legal opinion that BitClout was not engaged in a securities offering.

67.     On March 18, 2021, around the time of BitClout's public launch described below, Al-Naji obtained an opinion letter from a prominent U.S. law firm that concluded that BTCLT sales were not likely to be deemed securities transactions under federal law.

68.     The opinion relied extensively on Al-Naji's description of the BitClout project and its native token in which he falsely represented that (i) "no funds were raised or will be raised to finance the development or upgrade of the [BitClout] Network," (ii) there will be no "individual or corporate entity" that "maintains sole control over the Network," and (iii) BTCLT would be marketed "solely for consumptive use" and that Al-Naji had not "and will not promote or support listing or trading of [BTCLT] on any third-party trading firm," even though the opposite was true in all respects.

69.     Al-Naji shared that legal opinion with a number of early investors and crypto asset trading platforms as part of a concerted effort shortly after BitClout's public launch to list BTCLT on those platforms, assuring them that his project was supposedly on solid legal footing.

70.     The simple reality, however, was that Al-Naji controlled the issuance of BTCLT and controlled BitClout. He could select investors who could obtain BTCLT and when they could do so; he controlled the so-called "autonomous" computer program that issued BTCLT from the BitClout platform; he controlled the price at which BTCLT was issued; he maintained sole custody

over the "treasury" wallet that held the bitcoin proceeds; and he was primarily responsible for the design, development, and maintenance of the BitClout platform.

71.     As Al-Naji explained, in November 2020, to one of his earliest prominent investors, he "went ahead and hard-coded the price in the contract for you to $1 per [BTCLT], which I didn't do for anyone else.  It's important to note that this the lowest price any non-angel will *ever get* and significantly lower than the last several purchases we've processed."

### 3.     Sales to Select Investors

72.     Al-Naji structured two purchase rounds for venture capital investors that he personally solicited.  During the first round, approximately 2 million BTCLT at $6 per token, were sold via 39 separate contracts dated between January 28, 2021 and February 12, 2021.

73.     The second round involved the sale of approximately 1 million BTCLT at $16 per token that was sold via 31 contracts dated between January 29, 2021 and April 14, 2021.  Al-Naji, directly or indirectly, entered into another dozen other contracts for the sale of BTCLT in 2020 and 2021 at different prices per token.

74.     Al-Naji's ability to guarantee these prices in particular BTCLT sales further demonstrate that he, rather than some autonomous mechanism, dictated the pricing and issuance of BTCLT.

75.     Purchasers of BTCLT through these contractual sales were not restricted in their ability to resell their BTCLT at any time and Al-Naji failed to take any steps to verify the accreditation status of the investors.

76.     In total, Al-Naji raised approximately $41 million from these contractual sales of BTCLT.  Al-Naji also raised approximately $63 million from sales of BTCLT on the BitClout platform to other selected investors to whom he gave passwords which enabled them to purchase

directly from the protocol, and whose accreditation status Al-Naji failed to verify. The remaining approximately $153 million of the $257 million amassed in BitClout's treasury wallet was raised via public sales of BTLCT to investors from the BitClout platform, as described below.

### 4. Public Sales of BTCLT

77. In March 2021, Al-Naji began selling BTCLT to the investing public, including investors in the United Sates, through the so-called "public launch" of BitClout. Investors purchased BTCLT directly from BitClout by transferring bitcoin to BitClout's treasury wallet using the BitClout platform.

78. As described above, one of the features of the BitClout platform was the ability to purchase Creator Coins using BTCLT. Creator Coins were billed as a crypto asset that would rise and fall in value with the reputation of the person with whom a particular Creator Coin's identity was associated. In other words, the business model that Al-Naji touted to investors was that BTCLT would be needed to purchase Creator Coins, which in turn permitted speculators to invest in the value of a celebrity's brand. Thus, as Al-Naji promoted it, if BitClout was successful, more people would want to buy Creator Coins, raising the demand and therefore the value and price of BTCLT, such that BTCLT investors would profit.

79. BitClout executed a soft launch of its platform on or around March 12, 2021, when Al-Naji began enabling the purchase of Creator Coins with BTCLT on the BitClout website via passwords that Al-Naji sent to a select group of personal contacts.

80. As before, the business model that Al-Naji touted was that because BTCLT was needed to speculate on Creator Coins, BTCLT would become more valuable if the BitClout platform and its Creator Coins became more popular based upon BitClout's efforts to entice celebrities and others to join the BitClout platform in order to claim their Creator Coins.

81.    Al-Naji encouraged these contacts (including early investors) to send links (and passwords) for the BitClout website "to a few trusted people" who the contacts were "100% sure aren't going to leak it so they can buy BitClout ahead of the open and participate in the creator coin launch."  Al-Naji explained that his goal was to let that information leak organically so that the BitClout platform and its website could scale up leading to a public launch.

82.    However, BitClout links and passwords began to circulate on social media, which according to Al-Naji in an email he sent to a public relations firm he had hired, was "against the core team's wishes since the platform was still too early for mainstream attention."

83.    After the platform's launch, Al-Naji and his developers struggled to keep up with demand on the website and to manually curate the content that appeared on the BitClout social media feed.

84.    Eventually, between late March and early April 2021, Al-Naji removed the password protection, enabling anyone to purchase BTCLT from the BitClout platform.

85.    Subsequently, Al-Naji obtained BTCLT's listings on several crypto asset trading platforms, including Blockchain.com (June 15, 2021), AscendEX (July 15, 2021), and Coinbase (December 13, 2021), and Huobi (now known as HTX) (June 26, 2023).

86.    To coincide with the initial listing, in early June 2021 Al-Naji sought to boost BTCLT's price by announcing publicly that he would be "turning off the ability the buy [BTCLT] with Bitcoin" on the platform, thereby fixing the supply of BTCLT.

87.    Al-Naji stated publicly that he reserved two million of the initial supply of BTCLT for himself as the founder.  Accordingly, by choosing to limit the supply of BTCLT to 10.8 million, Al-Naji ended up controlling approximately 19% of all BTCLT in existence.

88.     In a post on BitClout's social media feed on June 3, 2021, Al-Naji, as Diamondhands, described the benefits of fixing the supply of BTCLT at this moment, which he referred to as the "Deflation Bomb":

> In preparation for BitClout's first exchange listing [on Blockchain.com], I'm thrilled to announce the most deflationary event in BitClout history. [BTCLT]'s supply will be fixed forever at block 33,783 (Saturday June 12th). We call this the Deflation Bomb … Why is this good? An asset's value is determined by supply and demand. When supply stays fixed, higher demand has more impact. This means every new user who joins now creates value for all existing [BTCLT] holders rather than diluting everyone. No more inflation. [BTCLT] is also burned in certain transactions to reduce the supply even further. For example, every profile creation already burns [BTCLT], and we believe there will be many more opportunities to burn [BTCLT] in the future. With these changes, [BTCLT] can now evolve from being just a currency to being a globally-recognized store of value. Where Bitcoin is digital gold and Ethereum is digital oil, [BTCLT] can now finally claim its seat at the table ... as digital $CLOUT.

89.     Al-Naji further explained to an investor that following the Deflation Bomb, purchases of BTCLT on BitClout would be directed to the crypto asset trading platform :Blockchain.com "so they get a boost in users and so that price goes up when it lists."

90.     Al-Naji later disclosed to another investor in September 2021 that he had spent a total of $15 million of BTCLT investor proceeds to purchase BTCLT on Blockchain.com.

91.     Following BitClout's public launch, and in connection with BTCLT's listing on crypto asset trading platforms, Al-Naji continued to promote BitClout and BTCLT's investment potential.

92.     Al-Naji, still maintaining anonymity, also used investor proceeds to engage public relations firms to manage communications for the project, and compensated celebrities and social media influencers to join and promote the platform.

93.    Al-Naji also continued to make regular public statements concerning the platform and value of BTCLT on BitClout itself.

94.    For example, in a post from "Diamondhands" on BitClout's social media feed in connection with the listing of BTCLT on Blockchain.com, where BTCLT began trading at approximately $175, Al-Naji wrote: "Today BitClout goes from being just an experiment to being the NYSE of creators.  To celebrate, I thought I'd take a moment to tell you what gets me so excited about the future of BitClout … And the best part?  We're all so unbelievably early to this phenomenon.  If [Facebook] is worth $1 trillion, and if BitClout has all of these advantages, then what should BitClout be worth?  Even at just $10 billion, the coin price is $10B/10.8M = ~$925"

95.    In another Diamondhands social media post on the BitClout platform on July 5, 2021, Al-Naji stated:

> We're all aligned by the fact that we hold [BTCLT], and [BTCLT] appreciates with higher transaction volume.  The more devs that build on BitClout, and the more open it is, the more we all make. This is by design … There is no separate company with equity-holders, and no room for misalignment here.  [BTCLT] appreciates as txn volume increases, and transaction volume is maximized when we unleash open, decentralized free markets … And we're all aligned because doing this will maximize transaction volume, which will maximize the value of [BTCLT].  The incentives are all set for an explosion of innovation in social like we've never seen before. And once it hits, we'll wonder how we ever lived without it.

96.    And, on September 9, 2021, following a downturn in the price of BTCLT, Al-Naji, as Diamondhands, posted on the BitClout social media platform that users should not:

> "worry about the lull right now.  I'm not aware of a single crypto project that didn't have a period like this, including Bitcoin and Ethereum.  Ethereum in particular was aggressively labeled as a scam when it launched.  All of this is natural, and I think we'll come out of this dip stronger than ever, with a base that better understands the full potential of what we're doing.  This is it: The moment when the paper hands fold, and the true believers buy the dip."

97.     In total, Al-Naji sold at least $257 million of BTCLT to investors, including at least $153 million during the public sale.

98.     No registration statement was ever filed with the SEC or in effect with respect to, and no exemption from registration was available for, any of the above offers and sales of BTCLT, be it the private or public sales.  Thus, the offers and sales of BTCLT set forth above violated the registration provisions of the federal securities laws.

### C.     Al-Naji Misrepresents the Use Of Investment Proceeds

99.     As described above and further below, during and in connection with the unregistered offer and sale of BTCLT, Defendant intentionally or recklessly made materially false and misleading statements to potential and actual BTCLT investors.

100.     In addition, contrary to Defendant's express representations to investors, Al-Naji spent significant sums of investor funds on expenses that were entirely unrelated to the development of the BitClout platform.

101.     As noted, Al-Naji sought to create the illusion of supposed decentralization and autonomy to the investing public with respect to BTCLT.  However, the falsity of these statements—and Al-Naji's understanding thereof—is demonstrated, for example, by the fact that Al-Naji privately told select early investors in BitClout that he in fact controlled the investment proceeds and, importantly, that he in fact was using the BitClout platform's treasury wallet to fund the project's costs, including hiring developers and other employees.

102.     But even these statements to private investors were materially false and misleading and omitted material information, as Al-Naji knew or recklessly disregarded, because Al-Naji did not disclose to these early investors that investors funds would be used to fund Al-Naji's personal expenses, including rental of a Beverly Hills mansion and payments to his family members.

103.    The foregoing information was material because a reasonable investor would have considered such information, including information about who was behind the project and what the funds would be used for, important to their investment decisions.

104.    In general, even though Al-Naji was telling some select investors in private that Al-Naji controlled the investment proceeds, Al-Naji generally resisted making any formal commitments about the use of investment proceeds in writing and tried to publicly disclaim control over the proceeds.

105.    To further the illusion that he did not personally control investment proceeds, Al-Naji engaged in other deceptive conduct and courses of conduct, including incorporating Relief Defendant IHL to broker BTCLT sales by entering into contracts of sale for BTCLT with investor counterparties, receiving funds from those counterparties, and custodying BTCLT on their behalf, or transferring BTCLT to those investors.

106.    When certain investors suggested an amendment to the purchase and custody agreement with IHL to make explicit that IHL would use proceeds from their investments to support the BitClout protocol, Al-Naji rejected the changes.

107.    BitClout's treasury wallet was maintained at a publicly identifiable address on the Bitcoin blockchain.  Thus, at the time of BitClout's public launch in March 2021, investors and critics of the platform could see that the project's treasury wallet contained a large bitcoin balance. Some investors criticized the platform's one-way mechanism, which only permitted BTCLT to be purchased and not sold.

108.    At least one early investor who understood that Al-Naji was, in fact, using investment proceeds to compensate himself and his development team, urged him to be transparent about his use of the proceeds and not keep the accumulated bitcoin for himself.

109.    Rather than heed this advice, Al-Naji made additional materially false and misleading statements about BitClout's bitcoin treasury wallet in a press interview conducted during the month of BitClout's public launch in March 2021.

110.    Specifically, in an interview with Decrypt published on March 26, 2021, Al-Naji, speaking as his pseudonymous persona "Diamondhands," falsely assured readers that "neither he nor BitClout's developers would use [the treasury wallet] to pay themselves, saying their financial incentives are instead tied to the success of the BTCLT token—which he says will one day be traded on exchanges, providing a way for its holders to cash out."  In the interview, Diamondhands explained that "BitClout's developers will soon announce plans to use its Bitcoin stash for something 'good.'"

111.    The true picture of Al-Naji's use of BitClout investment proceeds starkly differed from his materially false and misleading representations to investors that BitClout was an autonomous operation and his public statements that he would not use BitClout proceeds to enrich himself or to pay other developers, as Al-Naji knew or recklessly disregarded.

112.    In February 2021, Al-Naji also misrepresented to a prominent U.S. venture capital firm, which was negotiating a contract with Al-Naji to purchase BTCLT through the Al-Naji-controlled entity IHL, that IHL "is merely purchasing [BTCLT] from the protocol, and it does not have any control over the funds after this purchase is complete."  This representation was false, as Al-Naji, through IHL, *did* control funds used to purchase BTCLT and this information was material because a reasonable investor would have considered such information important to their investment decisions.

113.    After incorporating IHL in July 2020, Al-Naji opened a bank account and crypto asset over the counter ("OTC") trading account in IHL's name in December 2020 and January 2021, respectively.

114.    Al-Naji represented to the bank that IHL was a "software developer" that was developing BitClout—not a broker or trader as he had represented to investors.

115.    Al-Naji had many early investors deposit fiat currency (e.g., U.S. dollars) into the IHL bank account.  He then transferred those funds to the IHL crypto asset OTC account to convert the fiat currency to bitcoin, and then transferred that bitcoin to the BitClout treasury wallet in return for BTCLT.

116.    In total, the BitClout treasury wallet amassed more than 4,984 bitcoin (valued at over $257 million) from investors, of which Al-Naji has withdrawn 2,458 bitcoin (valued at over $78 million) ) including by sending some of it back to the same crypto asset and bank accounts in the name of IHL, and subsequently on to a brokerage account in his own name.

117.    Al-Naji used significant sums from investors to enrich himself and his family members and to compensate those affiliated with the BitClout project.

118.    Among other expenditures, Al-Naji used investor funds to: pay his own living expenses, including the rental of a six-bedroom mansion in Beverly Hills and personal credit card payments; fund extravagant gifts of cash (of at least $1 million each) to his wife, Relief Defendant Buse Desticioğlu Al-Naji, and his mother Relief Defendant Joumana Bahouth Al-Naji; transfer funds to accounts in the names of his wholly-owned entities, including Relief Defendants IHL, Firestorm Media LLC, Viridian City, LLC, and DeSo Foundation; and to fund personal investments in other crypto asset projects.

119.    In addition to personally enriching himself and his relatives, Al-Naji transferred investor funds to BitClout developers, programmers, and promoters, contrary to his public statements that he had not and would not use investor proceeds to compensate himself or members of BitClout's development team.

120.    In fact, to pay certain members of that development team in BTCLT, Al-Naji transferred investor funds from the BitClout treasury wallet to those individuals and then had them purchase BTCLT by sending the bitcoin back to the treasury wallet.

121.    This round-trip transaction had the effect of recycling funds through the treasury wallet and, because new BTCLT was created as a result, artificially raising the price at which the platform sold BTCLT to other investors thereafter.

122.    In September 2021, Al-Naji decided to rebrand the entire BitClout project to "DeSo" (short for "Decentralized Social").  In connection with the relaunch, Al-Naji publicly revealed himself to have been Diamondhands, which had essentially been an open secret.  Al-Naji created the DeSo Foundation as part of the rebrand to support the newly-named DeSo platform, and claimed to have capitalized it with $200 million (the remaining amount of capital raised from the initial sale of BTCLT to early investors).

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Against Defendant Al-Naji)

123.    The Commission realleges and reincorporates paragraphs 1 through 122 as if fully set forth herein.

124.    Defendant, directly or indirectly, by use of means of instrumentalities of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of securities: (a) knowingly or recklessly employed devices, schemes or artifices to defraud; (b)

knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact, or have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.  In connection with the offer and sale of BTCLT, Defendant made material misrepresentations of fact and engaged in other deceptive conduct, including but not limited to material misrepresentations regarding the use of investor proceeds for Defendant's own personal benefit.

125.    By reason of the actions alleged herein, Defendants violated and unless enjoined will continue to violate Securities Act Section 17(a), 15 U.S.C. § 77q(a).

**SECOND CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Against Defendant Al-Naji)**

126.    The Commission realleges and reincorporates paragraphs 1 through 122 as if fully set forth herein.

127.    By reason of the conduct described above, Defendant, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, directly or indirectly, knowingly or recklessly (1) employed devices, schemes, or artifices to defraud and/or (2) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and/or (3) engaged in acts, practices, or courses of business which operates or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.  In connection with the offer and sale of BTCLT, Defendant made material misrepresentations of fact and engaged in

other deceptive conduct, including but not limited to material misrepresentations regarding the use of investor proceeds for Defendant's own personal benefit.

128.    By reason of the actions alleged herein, Defendant violated and unless enjoined will continue to violate Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5(a) and (c).

### THIRD CLAIM FOR RELIEF
**Violations of Securities Act Section 5(a) and (c)**
**(Against Defendant Al-Naji)**

129.    The Commission realleges and reincorporated paragraphs 1 through 122 as if fully set forth herein.

130.    By engaging in conduct alleged above, Defendant, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce, or of the mails, offered to sell or sold securities, or carried or caused such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.  Defendant created, drafted, edited, and approved promotional materials for BTCLT, and made statements to induce investors to purchase these securities.  Defendant directly or indirectly received proceeds from the sale of these securities.

131.    No registration statement was filed with the Commission or was in effect with respect to the securities offered by Defendant prior to the offer or sale of these securities.

132.    By engaging in the foregoing misconduct, Defendant has violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Against All Relief Defendants)

133.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 122.

134.    Relief Defendant Buse Desticioğlu Al-Naji received at least $1.46 million in BTCLT investor funds.  Relief Defendant Buse Desticioğlu Al-Naji had no legitimate claim to the funds she received. Relief Defendant Buse Desticioğlu Al-Naji obtained the funds under circumstances in which it is not just, equitable, or consciable for her to retain the funds, and therefore was unjustly enriched.

135.    Relief Defendant Joumana Bahouth Al-Naji received at least $1 million in BTCLT investor funds.  Relief Defendant Joumana Bahouth Al-Naji had no legitimate claim to the funds she received.  Relief Defendant Joumana Bahouth Al-Naji obtained the funds under circumstances in which it is not just, equitable, or consciable for her to retain the funds, and therefore was unjustly enriched.

136.    Relief Defendants IHL, Firestorm Media, LLC, Viridian City, LLC, and DeSo Foundation are corporate entities created and controlled by Al-Naji and to which he transferred BTCLT investor proceeds.  IHL, Firestorm Media, LLC, Viridian City, LLC, and DeSo Foundation had no legitimate claim to the funds they received.  Relief Defendants IHL, Firestorm Media, LLC, Viridian City, LLC, and DeSo Foundation obtained the funds under circumstances in which it is not just, equitable, or consciable for them to retain the funds, and therefore they were unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

(a)    finding that Al-Naji violated the antifraud and registration provisions of the federal securities laws as alleged herein;

(b)    permanently enjoining Al-Naji from violating Securities Act Sections 5(a), 5(c), and 17(a), 15 U.S.C. §§ 77e(a), 77e(c), 77q(a); and Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

(c)    imposing an injunction pursuant to Exchange Act Section 21(d)(5), 15 U.S.C. § 78u(d)(5), permanently enjoining Al-Naji from participating, directly or indirectly, including, but not limited to, through any entity controlled by him, in any offer or sale of securities, including any crypto asset security; provided, however, that such injunction shall not prevent Al-Naji from purchasing or selling securities, including any crypto asset security, for his own personal account;

(d)    ordering Al-Naji and Relief Defendants Buse Desticioğlu Al-Naji, Joumana Bahouth Al-Naji, IHL, Firestorm Media, LLC, Viridian City, LLC, and DeSo Foundation to disgorge all ill-gotten gains, plus prejudgment interest thereon, wrongfully obtained as a result of Al-Naji's illegal conduct, pursuant to Exchange Act Sections 21(d)(3), (5) and (7), 15 U.S.C. §§ 78u(d)(3), (5) and (7);

(e)    ordering Al-Naji to pay civil penalties pursuant to Securities Act Section 20(d), 15 U.S.C. § 77t(d), and Exchange Act Section 21(d), 15 U.S.C. § 78u(d);

(f)    permanently barring Al-Naji pursuant to Exchange Act Section 21(d)(2), 15 U.S.C. § 78u(d)(2), and Securities Act Section 20(e), 15 U.S.C. § 77t(e), from acting as an officer or director of any issuer that has a class of securities registered pursuant to Exchange Act Section 12, 15 U.S.C. § 78l, or that is required to file reports pursuant to Exchange Act Section 15(d), 15

U.S.C. § 78o(d); and

  (g)  granting such other relief to the Commission as the Court may deem just and proper.

Dated: July 30, 2024

       Respectfully submitted,

       SECURITIES AND EXCHANGE
       COMMISSION

       /s/ Christopher J. Carney
       Christopher J. Carney
       Geoffrey Gettinger (*pro hac vice* application
       to be submitted)
       U.S. Securities and Exchange Commission
       100 F Street, N.E.
       Washington, DC 20549
       Tel: (202) 551-2379 (Carney)
       carneyc@sec.gov